UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Dina Halsey-Ricks

     v.                             Civil No. 23-cv-481-LM
                                       Opinion No. 2024 DNH 060 P

Social Security Administration,
Commissioner

## O R D E R

Plaintiff Dina Halsey-Ricks brought this action seeking judicial review of the decision of the Commissioner of the Social Security Administration ("the Commissioner") denying her applications for disability insurance benefits under Title II of the Social Security Act. Halsey-Ricks moves to reverse the Commissioner's decision (doc. no. 26), and the Commissioner moves to affirm (doc. no. 27). Ricks argues that an Administrative Law Judge ("ALJ") erred by failing to account for her treating physicians' medical opinions in assessing her residual functional capacity; by failing to assess her ability to work sustainably; by failing to address all factors under 20 C.F.R. § 404.1520c(c); and by failing to consider Halsey-Ricks's medical conditions in evaluating jobs recommended by a vocational expert. For the following reasons, the court affirms the Commissioner's decision.

## STANDARD OF REVIEW

In reviewing the final decision of the Commissioner under 42 U.S.C. § 405(g), the court "is limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." Nguyen v. Chater,

172 F.3d 31, 35 (1st Cir. 1999); accord Sacilowski v. Saul, 959 F.3d 431, 437 (1st Cir. 2020). The court defers to the ALJ's factual findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); see also Fischer v. Colvin, 831 F.3d 31, 34 (1st Cir. 2016). "Substantial-evidence review is more deferential than it might sound to the lay ear: though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not." Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018) (citation omitted). Rather, the court "must uphold the Commissioner's findings if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support her conclusion." Id. (citation and alterations omitted).

### DISABILITY ANALYSIS FRAMEWORK

The Social Security Administration's regulations set out a five-step, sequential process that ALJs must follow to evaluate whether a person is "disabled" under the Social Security Act—that is, unable to engage in any "substantial gainful activity." See 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1520. The five steps are as follows:

- **Step One**: If the claimant is presently engaging in substantial gainful activity, she is not disabled. § 404.1520(b). If the claimant is not engaging in substantial gainful activity, the ALJ proceeds to the second step. Id. § 404.1520(a)(4).

- **Step Two**: If the claimant does not have any impairment or any combination of impairments that significantly limits her physical or mental ability to do basic work activities, she is not disabled because she lacks a "severe" impairment. Id. § 404.1520(c). If the

claimant has a severe impairment or combination of impairments, the ALJ proceeds to the third step. Id. § 404.1520(a)(4).

- **Step Three**: If any of the claimant's impairments meet or equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she <u>is</u> disabled—and the ALJ need not proceed to steps four and five. Id. § 404.1520(d). If the claimant's impairments do not meet or equal the listed impairments, the ALJ proceeds to the fourth step. Id. § 404.1520(a)(4).

- **Step Four**: If the claimant's impairments do not prevent her from doing her past relevant work, then she is <u>not</u> disabled. Id. § 404.1520(e)-(f). If the claimant is unable to do her past relevant work, the ALJ proceeds to the fifth step. Id. § 404.1520(a)(4).

- **Step Five**: If the claimant's impairments do not prevent her from doing other work that exists in the national economy, then she is <u>not</u> disabled. Id. § 404.1520(g). If the claimant is not able to do other work, then she <u>is</u> disabled. Id. § 404.1520(a)(4).

At steps one through four, the claimant has the burden of proof. Sacilowski, 959 F.3d at 433-34. At step five, however, the Commissioner has the burden of proof. Id.

If the claimant meets her burden at the first two steps of the sequential analysis, but not at the third, the ALJ proceeds to steps four and five, which begin with a determination of the claimant's "residual functional capacity," i.e., a determination of what kinds of things the claimant can and cannot do, mentally and physically. See 20 C.F.R. § 404.1545(a)(1). A person's residual functional capacity is an assessment of "the most" the claimant can do despite her limitations. Id. After the ALJ determines the claimant's residual functional capacity, the ALJ compares that assessment against the demands of the claimant's past work (at step four) and

against other jobs that exist in the national economy (at step five). § 404.1520(e)-(g).
If the claimant's residual functional capacity allows her to perform her past
relevant work or work that exists in the national economy, the claimant is not
disabled. See § 404.1520(a)(4)(iv)-(v), (e), (f).

## BACKGROUND[1]

Halsey-Ricks applied for disability insurance benefits in September 2019. She
claimed a disability beginning on November 1, 2018, and was last insured on
December 31, 2020. Halsey-Ricks alleged impairments including "multiple chemical
sensitivity" and myriad symptoms related to her sensitivity. The Social Security
Administration denied Halsey-Ricks's application, and she timely requested
reconsideration. The Social Security Administration upheld the denial, and Halsey-
Ricks requested a hearing before an ALJ. The ALJ held a hearing in May 2021.[2]

During the hearing, Halsey-Ricks and a vocational expert testified. Halsey-
Ricks was 52 years old at the time of the hearing. She has a master's degree in
psychology and started but did not finish a Ph.D. in child clinical psychology.
Halsey-Ricks was the director of clinical services at a child crisis center for 13 years,
until her multiple chemical sensitivity forced her to stop working in 2015. Halsey-
Ricks testified that her multiple chemical sensitivity rendered her allergic to "pretty
much everything." Administrative Record ("AR") at 44. Among her allergy triggers,

---

[1] The court recounts only the facts of Halsey-Ricks's extensive medical record
that are needed to resolve the issues she raised.

[2] The ALJ held the hearing by telephone with the assent of all parties because
of the extraordinary circumstances presented by the COVID-19 pandemic.

she listed plastics, rubber, wrappers, coins, food, and clothing. Halsey-Ricks testified that, when exposed to chemicals, she broke out in severe skin rashes and struggled to breathe.

To avoid exposures, Halsey-Ricks testified that she lived in one room of her house and almost never left her home. She testified that she spent most days lying in bed, researching medical treatments online, and doing laundry. She further testified that she was unable to try most treatments suggested by her doctors because the treatments required her to interact with different chemicals. Halsey-Ricks testified that—as a preventative measure—she took three (dye-free) Benadryl capsules if she anticipated an exposure to one of her allergy triggers. She also testified that her multiple chemical sensitivity caused her "brain fog," id. at 47, and "considerable psychological strain," id. at 52.

During the hearing, the vocational expert testified that he had enough information to classify Halsey-Ricks's past work. He then classified her past work as clinical therapist—sedentary, and social welfare administrator—sedentary.

In addition to the medical record, the evidence before the ALJ included: (1) opinions from Dr. Flavia Hoyte, Halsey-Ricks's treating physician; (2) opinions from Drs. Barrett and Snyder, the state agency consultants who reviewed the medical record; (3) an opinion from Karen Kalbach, a nutritional consultant and massage therapist; and (4) interrogatory responses from the vocational expert.

I.    Dr. Hoyte's Opinions

The ALJ considered the opinions of Halsey-Ricks's treating physician, Dr. Flavia Hoyte. Dr. Hoyte is an immunologist who began treating Halsey-Ricks in 2017. Dr. Hoyte provided two opinions from 2017 (prior to the date on which Halsey-Ricks alleged she became disabled from her impairments) and one opinion from 2019.

Dr. Hoyte first saw Halsey-Ricks in February 2017. Dr. Hoyte listed Halsey-Ricks's self-reported symptoms and medical history, including her "most immediate and common reactions when exposed to a chemical to which she is sensitive," which included lymph node swelling, changes in her voice, and numbness or tingling. AR at 760.

Dr. Hoyte did not conduct a physical examination at that first appointment because of Halsey-Ricks's sensitivities but noted that she had a reaction when Dr. Hoyte first walked in the room. Halsey-Ricks's voice became hoarse, and she reported difficulty breathing. Dr. Hoyte noted, however, that those symptoms resolved within a few minutes. To the extent she was able to examine Halsey-Ricks, Dr. Hoyte reported that she had no active rashes and that she had no significant lymph node swelling to the touch. Dr. Hoyte further noted that Halsey Ricks had a normal heart rate and respiratory effort. Dr. Hoyte determined that, "[b]ased on symptom description, [Halsey-Ricks] has a severe case of multiple chemical sensitivities." Id. at 764. Dr. Hoyte was "reassured by the essentially normal testing today and review of her most recent testing, which is also fairly reassuring." Id. at 766.

6

In an examination with Dr. Hoyte in June 2017, Halsey-Ricks experienced the same reaction at the start of the appointment, but her voice again improved during the appointment. Halsey-Ricks reported that speech therapy exercises, which Dr. Hoyte had recommended, were not helpful. Dr. Hoyte instructed Halsey-Ricks that she "should continue wearing a mask and limiting her exposures as much as possible." AR at 1397. Dr. Hoyte reported at that appointment that Halsey-Ricks was in no acute distress. Dr. Hoyte also noted that she did lab tests at the February 2017 appointment, which "did not show a secondary cause for her symptoms/reactions." Id. at 755.

Finally, Dr. Hoyte examined Halsey-Ricks in December 2019, at which point Halsey-Ricks reported that her symptoms had worsened. Dr. Hoyte's narrative write-up regarding Halsey-Ricks's multiple chemical sensitivity, however, was almost identical to her opinion from previous appointments. Halsey-Ricks's vital signs were normal, and she was well-developed and well-nourished. Dr. Hoyte reported that she was limited in her ability to treat Halsey-Ricks because of her sensitivities.

On December 6, 2019, Dr. Hoyte filled out a "Supplementary Claim Disability Benefits" form, which described Halsey-Ricks's functional limitations. Id. at 846. Using the form's checkboxes, Dr. Hoyte indicated that Halsey-Ricks was partially house-confined but had not been hospital-confined. When asked about Halsey-Ricks's limitations and impairments, Dr. Hoyte checked off all limitations and impairments, indicating that Halsey-Ricks had limitations as to standing, walking,

climbing, stooping, using her hands, lifting, sitting, as well as psychological and other limitations. Based on these limitations. Dr. Hoyte opined that Halsey-Ricks had "[s]evere limitations of functional capacity," rendering her incapable of even minimal sedentary work. Id. at 847. Dr. Hoyte also opined that Halsey-Ricks had "significant loss of psychological, physiological, personal and social adjustment." Id.

In her supplemental answers on the form, Dr. Hoyte listed numerous subjective symptoms and objective findings. As to subjective symptoms, Dr. Hoyte listed the myriad symptoms Halsey-Ricks had reported in examinations. With respect to objective findings, Dr. Hoyte stated that Halsey-Ricks "has shared numerous photos of . . . rashes occurring after environmental exposures[,] she describes observable lymph node swelling and angioedema," and Halsey-Ricks's voice changed during appointments. Id. at 848. As for Halsey-Ricks's limitations, Dr. Hoyte stated that her "chemical sensitivities severely limit every aspect of her life (occupational, interpersonal, psychological, physical, self-care, etc.) on a daily basis. She is unable to engage in simple tasks of daily living without experiencing symptoms." Id. at 849.

II.    State Agency Consultant Opinions

Two state agency consultants, Drs. Barrett and Snyder, also gave opinions based on their reviews of the medical records.

A.    Dr. Barrett's Opinion

Dr. Barrett issued an opinion on April 14, 2020. Dr. Barrett stated that Halsey-Ricks had several medically determinable impairments, including "disorders

of back—discogenic and degenerative," asthma, thyroid gland disorders, systemic lupus erythematosus, and migraines. Id. at 86. He determined that all impairments were "severe." Id. However, Dr. Barrett's answers on the form indicated that he did not believe that Halsey-Ricks's "statements about the intensity, persistence, and functionally limiting effects of [her] symptoms" were "substantiated by the objective medical evidence alone." Id. at 87. At the same time, his answers indicated that he did think that Halsey-Ricks's medically determinable impairments could "reasonably be expected to produce [her] pain or other symptoms." Id.

With respect to her residual functional capacity, Dr. Barrett determined that Halsey-Ricks had environmental limitations, indicating that she should "[a]void concentrated exposure" to extreme cold, extreme heat, fumes, odors, dusts, gases, poor ventilation, and hazards.[3] Id. at 89. Dr. Barrett further opined that Halsey-Ricks did not need to limit her exposure to wetness, humidity, noise, and vibration.

Dr. Barrett ultimately concluded based on the documented findings that Halsey-Ricks was not disabled. In support of his conclusion, Dr. Barrett noted that her condition "results in some limitations" and "may prevent [her] from doing [her] past jobs," but that Halsey-Ricks was not prevented from working all jobs. Id. at 91.

---

[3] Drs. Barrett and Hoyte also rendered opinions regarding Halsey-Ricks's exertional, postural, and manipulative limitations. In her appeal of the Commissioner's decision, however, Halsey-Ricks only challenges the ALJ's findings as to her multiple chemical sensitivity.

B.    Dr. Snyder's Opinion

Dr. Snyder issued an opinion on October 7, 2020, after Halsey-Ricks

requested reconsideration of the then-Acting Commissioner's initial denial of her

application. Dr. Snyder stated that Halsey-Ricks's statements regarding her

symptoms were only "partially consistent" with the medical and non-medical

evidence in the file because her limitations were "not to the extent she states." Id. at

100. Dr. Snyder's evaluation endorsed Dr. Barrett's evaluation.  Dr. Snyder

determined that there was "no evidence of increased impairment" with new medical

evidence of record and concluded that the "[i]nitial evaluation is endorsed." Id. at

102.

III.   Karen Kalbach's Opinion

Kalbach provided an opinion on January 22, 2019. Kalbach possesses a

bachelor's degree in Exercise Science and worked as a Certified Nutritional Coach

and a Licensed Massage Therapist. Between November 2018 and December 2020,

Kalbach provided Halsey-Ricks with homeopathic treatment on a weekly basis.

Treatment included homeopathic supplements, tests, and cleanses. Kalbach opined

that Halsey-Ricks suffered from various allergies caused by her multiple chemical

sensitivity. Kalbach stated that, during appointments, she observed "voice

hoarseness and tangential speech" and Halsey-Ricks "reported cognitive confusion,

difficulty focusing, lymph node swelling, congestion, and headaches." Id. at 835.

Kalbach noted, however, that Halsey-Ricks "has been willing to implement

all [advice] given to regain her health and resume her life and ability to react in a

typical work environment." Id. at 836. She further opined that it "seem[ed] highly improbable that any work environment could be controlled to the extent that [Halsey-Ricks] would not be exposed to the chemicals, molds and fragrances to which she reacts." Id. Ultimately, Kalbach expressed that "[a]voidance of the aforementioned environmental exposures is paramount to [Halsey-Ricks's] health. Testing and direct observation support that [Halsey-Ricks] is unable to work due to the severity of her environmental reactivity and resulting impairments." Id.

IV.   The Vocational Expert's Interrogatories

On October 14, 2021, the ALJ requested further information from the vocational expert, asking him to complete post-hearing interrogatories.[4] The interrogatories asked the vocational expert to assume that an individual with Halsey-Ricks's qualifications and experience has the residual functional capacity to perform light-exertion work. The interrogatories further stated that the hypothetical person can "have only occasional exposure to extremes of heat and cold, to dusts, fumes, odors and other pulmonary irritants, and to hazards." Id. at 584. On October 28, 2021, the vocational expert completed the interrogatories. He opined that the hypothetical person could work as a small product assembler, a routing clerk or mail sorter, or a price marker. Id. at 591.

---

[4] The ALJ sent an initial request for the vocational expert to complete interrogatories on August 20, 2021. The vocational expert completed the first set of interrogatories on September 11, 2021. After Halsey-Ricks objected on various grounds, on October 14, 2021, the ALJ sent the vocational expert a new set of interrogatories—the operative interrogatories for purposes of this motion—which incorporated some of Halsey-Ricks's objections.

V.    The ALJ's Unfavorable Decision

The ALJ issued an unfavorable decision on December 23, 2021. The ALJ found that Halsey-Ricks was not disabled from November 1, 2018, through her last insured date of December 31, 2020. At step one, the ALJ found that Halsey-Ricks had not engaged in substantial gainful activity since the date of her claimed disability, November 1, 2018. At step two, the ALJ found that several of Halsey-Ricks's impairments were "severe," including multiple chemical sensitivity, degenerative disc disease, chronic fatigue, ulcerative colitis, and others. But, at step three, the ALJ found that Halsey-Ricks's impairments were not of the kind listed in Appendix 1 that automatically qualify a person as disabled. Accordingly, the ALJ moved to steps four and five.

The ALJ, reviewing the record and Halsey-Ricks's testimony, found that, considering her impairments, Halsey-Ricks had the residual functional capacity to perform light work, except for climbing ladders, ropes, and scaffolds. The ALJ found that Halsey-Ricks could occasionally climb stairs and ramps; occasionally stoop, kneel, crouch and crawl; frequently balance; and occasionally reach overhead with both arms. Further, the ALJ found that Halsey-Ricks was limited to understanding, remembering, concentrating, and making judgments, and could only make work-related decisions in the context of performing simple, routine tasks. Most notably, considering Halsey-Ricks's multiple chemical sensitivity, the ALJ found that she could have only occasional exposure to hot and cold extremes, dust, fumes, odors, and irritants, and to hazards. The ALJ determined that Halsey-Ricks could have no work interactions with the public.

The ALJ assessed the consulting medical opinions provided by Drs. Barrett and Snyder, as well as the opinions provided by Halsey-Ricks's treatment providers, Dr. Hoyte and Karen Kalbach. The ALJ found Drs. Barrett and Snyder's opinions were persuasive because they were consistent with and "well supported by a detailed review and analysis of the objective medical evidence." AR at 23. Further, their opinions "were consistent with exams that showed the claimant often had no symptoms or reactions, presented in no acute distress and had normal lung, abdominal and skin exams." Id.

The ALJ found Dr. Hoyte's opinion unpersuasive because her opinions that Halsey-Ricks could not perform work of any kind and had severe environmental limitations were inconsistent with the other exams and reports in the record. The ALJ also found Kalbach's opinion unpersuasive because she was not an "acceptable medical source."[5] The ALJ noted, however, that "based on the entirety of the evidence, the [ALJ found] that the claimant should have no work interactions with the public because of the physical reactions she gets when she is around others." Id. at 24.

The ALJ found that, generally, Halsey-Ricks's medically determinable impairments could reasonably be expected to cause her alleged symptoms. However, the ALJ found that Halsey-Ricks's statements about the "intensity, persistence and

---

[5] "Acceptable medical source" under the regulation means a licensed physician, psychologist, optometrist, podiatrist, audiologist, Advanced Practice Registered Nurse, Physician Assistant, or a qualified speech-language pathologist. 20 C.F.R. § 404.1502(a).

limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Id. at 21. The ALJ also found that statements from Halsey-Ricks's treating medical providers did not persuasively identify limitations beyond those enumerated in her residual functional capacity.

After determining Halsey-Ricks's residual functional capacity, the ALJ found at step four that Halsey-Ricks was unable to perform her past work either as a clinical therapist or as an administrator. However, based on the vocational expert's opinion, the ALJ found that a person with Halsey-Ricks's residual functional capacity could perform jobs that existed in significant numbers in the national economy such as small product assembler, mail sorter, and price marker. Accordingly, based on her findings about Halsey-Ricks's residual functional capacity and the vocational expert's opinion, the ALJ found at step five that Halsey-Ricks was not disabled. See 20 C.F.R. § 404.1520(f).

## DISCUSSION

Halsey-Ricks argues that the ALJ's residual functional capacity findings are not supported by substantial evidence. Halsey-Ricks contends that the ALJ failed to properly consider the severity of her impairments, cherry-picked evidence to determine her residual functional capacity, and did not consider all required factors to evaluate the medical opinions. The Commissioner responds that the ALJ's conclusion as to Halsey-Ricks's residual functional capacity is consistent with the medical assessments in the record and supported by substantial evidence. The

Commissioner also contends that the ALJ's evaluation of Halsey-Ricks's own statements about her symptoms is supported by substantial evidence.

As noted, a person's residual functional capacity is an assessment of "the most" the claimant can do despite her limitations. See 20 C.F.R. § 404.1545(a)(1). In determining a person's residual functional capacity, the ALJ must consider "all of the relevant medical and other evidence" and all of the claimant's "medically determinable impairments" about which the ALJ is aware. Id. § 404.1545(a)(2), (a)(3). "In determining a claimant's [residual functional capacity], an ALJ must consider a claimant's subjective allegations of functional limitations, but she is not required to take those allegations at face value and may reject them where they are unsupported by the medical evidence, treatment history, and activities of daily living." E.g., Richards v. Kijakazi, 554 F. Supp. 3d 242, 252 (D. Mass. 2021); Richardson v. Saul, 565 F. Supp. 3d 154, 170 (D.N.H. 2021).

I.    The ALJ's Determination of Halsey-Ricks's Residual Functional Capacity Is Supported by Substantial Evidence

Halsey-Ricks argues that the ALJ's conclusion as to her residual functional capacity is not supported by substantial evidence because the ALJ ignored evidence of the severity of her multiple chemical sensitivity. Halsey-Ricks faults the ALJ for failing to give greater weight to the medical opinions of her treating physicians and for the ALJ's characterization of her multiple chemical sensitivity.

For purposes of determining a claimant's residual functional capacity, the ALJ considers the medical opinions and prior administrative medical findings in the

administrative record. 20 C.F.R. § 404.1520c(a). The ALJ determines the

persuasiveness of medical opinions and findings by looking at the following factors:

- The medical opinion's supportability;

- The extent to which the medical opinion is consistent
  with evidence from other sources;

- The medical source's relationship with the claimant,
  including the length, frequency, purpose, and extent of
  the relationship;

- The specialization of the medical source (i.e., whether
  the medical source has received advanced education and
  training in a specialty and whether he or she opines
  about matters with that area of specialty); and

- Certain other factors such as the familiarity of the
  medical source with the disability program.

Id. § 404.1520c(c). The most important factors are supportability and consistency.

Id. § 404.1520c(a); id. § 404.1520c(b)(2); Purdy v. Berryhill, 887 F.3d 7, 13 & n.8 (1st

Cir. 2018).

The ALJ's consideration of Dr. Hoyte's opinions is supported by substantial

evidence. The ALJ found Dr. Hoyte's opinions unpersuasive because they were

inconsistent with and unsupported by the objective medical evidence.[6] Dr. Hoyte

opined that Halsey-Ricks is unable to work in any setting because of her multiple

chemical sensitivity, and that Halsey-Ricks's symptoms are triggered "in all

settings," AR at 724; id. at 849 ("[Halsey-Ricks's] symptoms severely limit every

aspect of her life . . .  on a daily basis."). In her treatment notes, Dr. Hoyte does not,

---

[6] The ALJ considered Dr. Hoyte's opinions expressed in both her treatment
notes and the "Supplementary Claim Disability Benefits" form. Because Halsey-
Ricks's motion cites only to the ALJ's consideration of Dr. Hoyte's treatment notes,
the court focuses its consideration on this subset of evidence.

however, refer to objective evaluations and testing to corroborate her conclusions. Instead, Dr. Hoyte refers only to Halsey-Ricks's self-reported symptoms.

There is substantial evidence to support the conclusion that Dr. Hoyte's opinions are inconsistent with the objective medical evidence in the record. Dr. Hoyte's treatment notes showed that Halsey-Ricks had consistently normal clinical results for tests of her skin, lungs, and vitals. Halsey-Ricks reported experiencing lymph node swelling and rashes, but Dr. Hoyte stated that neither symptom was present upon examination. Further, when Halsey-Ricks had an allergic reaction during her appointments with Dr. Hoyte, the treatment notes state that symptoms resolved within minutes. Other treatment notes from other providers show that Halsey-Ricks presented at appointments with a hoarse voice, but otherwise normal pulmonary effort, normal lab results, and no respiratory distress. AR at 86, 98, 656-60, 663-67. A reasonable mind could conclude that Dr. Hoyte's opinions about the severity and limiting effects of Halsey-Ricks's symptoms were inconsistent with and unsupported by the medical evidence from a review of the entire record. Accordingly, the ALJ did not err in finding Dr. Hoyte's opinions unpersuasive.

To the extent Halsey-Ricks challenges the ALJ's consideration of Kalbach's opinions, the weight afforded Kalbach's opinion is supported by substantial evidence as well. Kalbach opined that it seemed unlikely that Halsey-Ricks could avoid exposure to her triggers in any work environment but expressed that avoidance of triggers was most important for Halsey-Ricks's health. Kalbach concluded that Halsey-Ricks could not work. There is no dispute that Kalbach is, as

the ALJ stated, "not [an] acceptable medical source and her statements concern issues reserved to the Commissioner." Id. at 24; 20 C.F.R. § 404.1502(a). Regardless, the ALJ considered Kalbach's opinions. In discussing Kalbach's statements, the ALJ concluded that "based on the entirety of the evidence, . . . the claimant should have no work interactions with the public because of the physical reactions she gets when she is around others." AR at 24. Thus, the ALJ both reviewed Kalbach's opinions and incorporated a restriction based on her opinions. The court finds no error in the ALJ's consideration of Kalbach's statements.

Halsey-Ricks also argues that the ALJ minimized the severity of her multiple chemical sensitivity because the ALJ found "no evidence of aggressive or invasive treatment" of her condition. Id. at 22. Halsey-Ricks contends that her medical history is lacking in aggressive treatment because such treatment will trigger her multiple chemical sensitivity. In support, Halsey-Ricks refers generally to her treatment history, stating that her "doctors have tried more direct and aggressive treatment but have been stymied by her many allergic reactions." Doc. no. 26 at 15. Halsey-Ricks cites Dr. Hoyte's treatment notes, which state that testing and treatment of allergies is limited "since she is so sensitive to medications and also cannot tolerate nebulizer treatments or supplemental oxygen due to the tubing." AR at 723-24. Halsey-Ricks also cites a provider's note from August 2018, in which the provider states that Halsey-Ricks is unable to "use home oxygen, despite the fact that the patient is relatively hypoxic, because of the smell of the plastic lines." Id. at 611. Additionally, Halsey-Ricks refers to a treatment note reporting her inability to

18

use a CPAP machine for her sleep apnea because of the plastics in the machine. <u>Id.</u> at 664.

The court finds no error in the ALJ's statement that there is no evidence of more aggressive treatment of Halsey-Ricks's multiple chemical sensitivity. The ALJ noted that Halsey-Ricks's condition "had not required hospitalization" and Halsey-Ricks reported to physicians that Benadryl often resolved her symptoms. <u>Id.</u> at 22. The ALJ also stated that Halsey-Ricks took precautions in her medical appointments, "such as wearing a respirator, not wanting to be touched, and insisting on limiting her exposures to chemicals." <u>Id.</u> Although Dr. Hoyte reports that testing options are limited because of Halsey-Ricks's sensitivity, her treatment notes do not indicate that Dr. Hoyte attempted any additional treatments. Instead, Dr. Hoyte's examinations indicate that Halsey-Ricks managed her condition without needing more intensive treatment. Indeed, Halsey-Ricks represents that the best treatment is avoidance of triggers.

Ultimately, the ALJ did not, as Halsey-Ricks argues, propose more appropriate treatment for Halsey-Ricks. Instead, the ALJ appropriately focused on Halsey-Ricks's residual functional capacity and concluded that "consistent, conservative courses of treatment prescribed by medical professionals, both before and after [the] alleged onset date do[] not conflict with a [residual functional capacity] of light work." Bourque v. Berryhill, No. 17-CV-268-LM, 2018 WL 3536087, at *10 (D.N.H. July 23, 2018). At bottom, the ALJ's findings about Halsey-Ricks's residual functional capacity are supported by substantial evidence.

II.    The ALJ Properly Assessed Halsey-Ricks's Ability to Perform and Maintain
       Gainful Employment

       Halsey-Ricks contends that the ALJ erred by failing to consider the impact of

Halsey-Ricks's multiple chemical sensitivity on her ability to perform sustained

gainful employment. In other words, Halsey-Ricks faults the ALJ for failing to

consider whether Halsey-Ricks could not only obtain a job, but keep a job.

       The ALJ need not make "separate findings on 'obtaining' and 'maintaining' a

job in every case, even cases in which the applicant does not suggest that there is

any difference between the issue of [her] ability to work and [her] ability to sustain

work." Frank v. Barnhart, 326 F.3d 618, 621 (5th Cir. 2003) (per curiam). The

record does not indicate that Halsey-Ricks can only work in short intervals.[7] Rather,

Halsey-Ricks argues that she cannot work at all. Therefore, the ALJ did not err in

her consideration of Halsey-Ricks's ability to obtain gainful employment.

III.   The ALJ Properly Addressed the Factors in 20 C.F.R. § 404.1520c(c)

       Halsey-Ricks argues that the ALJ failed to properly assess the

persuasiveness of a medical opinion under the multi-factored analysis in 20 C.F.R.

§ 404.1520c(c). See supra Discussion Part I. Halsey-Ricks specifically argues that

_____

       [7] Halsey-Ricks cites to a letter from a physician (which the ALJ did not
consider) dated November 4, 2015, three years prior to the date of her alleged
disability onset, in which a medical provider noted that Halsey-Ricks "had to leave
the office early to go home multiple times in the weeks preceding her medical leave
due to chemical exposures . . . . She was unable to perform her job responsibilities
. . . ." AR at 916. The letter was issued three years prior to the alleged onset date of
Halsey-Ricks's disability and is, therefore, outside of the period under consideration.
Moreover, the physician's opinion is neither consistent with nor supported by the
objective medical evidence. Thus, the ALJ did not err in failing to consider the letter
in assessing Halsey-Ricks's ability to obtain gainful employment.

the ALJ failed to discuss those factors in her consideration of her treating physician,
Dr. Hoyte, as well as the state agency consultants.

"Although the ALJ must <u>consider</u> all five of the factors in evaluating the
persuasiveness of medical evidence, the ALJ is, in most cases, only required to
<u>discuss</u> application of the supportability and consistency factors in the written
decision." Richardson, 565 F. Supp. 3d at 167. "Only where contrary medical
opinions are equally persuasive in terms of both supportability and consistency is
the ALJ required to discuss their relative persuasiveness in terms of the treatment
or[] examining relationship, specialization, and other factors." <u>Id.</u>

In her decision, the ALJ stated that the state agency consultants' opinions
were "well supported by a detailed review and analysis of the objective medical
evidence," and that their opinions were "consistent with exams that showed the
claimant often had no symptoms or reactions, presented in no acute distress and
had normal lung, abdominal and skin exams." AR at 23. The ALJ similarly assessed
the supportability and consistency of Dr. Hoyte's opinions. Although Halsey-Ricks
contends that the ALJ "is in no position to disregard the opinion of a treating
immunologist," under the applicable regulations, the ALJ is tasked with evaluating
all medical evidence and, in so doing, found Dr. Hoyte's opinions unpersuasive. As
previously discussed, that finding is supported by substantial evidence. Therefore,
the ALJ did not need to discuss the other factors in § 404.1520c(c). <u>See</u> Richardson,
565 F. Supp. 3d at 167. The court finds no error in the ALJ's consideration of these
medical opinions under § 404.1520c(c).

IV.   <u>The Jobs Proposed by the Vocational Expert Are Supported by Substantial
      Evidence</u>

Halsey-Ricks argues that the vocational expert's opinions, and the jobs the

expert opined that Halsey-Ricks could work, were not based on substantial

evidence. "For a vocational expert's opinion to constitute substantial evidence, the

testimony regarding an individual's ability to perform jobs in the national economy

must come in response to a hypothetical question that accurately describes the

claimant's impairments." Clark v. Kijakazi, 673 F. Supp. 3d 119, 130 (D.N.H. 2023)

(quotation marks omitted) (quoting Conrad v. Kijakazi, 666 F. Supp. 3d 161, 179 (D.

Mass. 2023)).

In post-hearing interrogatories, the vocational expert opined that a

hypothetical person in Halsey-Ricks's position has the residual functional capacity

to perform light work with occasional exposure to respiratory irritants, temperature

extremes, and hazards. The vocational expert opined that the hypothetical person

could work as a small product assembler, a routing clerk or mail sorter, or a price

marker. Based on the vocational expert's opinion, the ALJ determined that Halsey-

Ricks could find work in significant numbers in the national economy.

Halsey-Ricks argues that the ALJ ignored her symptoms in concluding that

she could maintain work in these or similar jobs because each job occurs in a work

environment full of allergy triggers. However, the ALJ's hypothetical question

incorporates the functional limitations expressed in the medical opinions the ALJ

found persuasive: the opinions of Drs. Barrett and Snyder. The state agency

consultants determined that Halsey-Ricks should avoid concentrated exposure to

triggers. The hypothetical question asked the vocational expert to assume that the hypothetical person could have only occasional exposure to allergy triggers or irritants. The ALJ's hypothetical is, therefore, consistent with the state agency consultants' opinions. Although Halsey-Ricks argues that she would be triggered in the workplace environments the vocational expert proposed, the ALJ's residual functional capacity findings were supported by substantial evidence, as discussed above. Therefore, the ALJ's hypothetical question, and the vocational expert's opinion, is supported by substantial evidence.

## CONCLUSION

The ALJ's findings are supported by substantial evidence. The decision of the Commissioner denying Halsey-Ricks's application for disability insurance benefits is affirmed. Halsey-Ricks's motion to reverse (doc. no. 26) is denied, and the Commissioner's motion to affirm (doc. no. 27) is granted. The clerk of court shall enter judgment and close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

July 23, 2024

cc:      Counsel of Record